ROBERT H. ROTSTEIN (SBN 72452)
rxr@msk.com
ERIC J. GERMAN (SBN 224557)
ejg@msk.com
JILL P. RUBIN (SBN 240019)
jpr@msk.com
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, California 90064-1683
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

Attorneys for Defendants,
NBC Universal, Inc., and
Gregory Thomas Garcia

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK GABLE,<br><br>        Plaintiff,<br><br>        v.<br><br>NATIONAL BROADCASTING COMPANY ("NBC"), a California corporation, GREGORY THOMAS GARCIA, an individual AND DOES 1 through 10, inclusive<br><br>        Defendants. | CASE NO.  CV 08-4013 SVW (FFMx)<br><br>The Honorable Stephen V. Wilson<br><br>**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[Declarations of Jill P. Rubin, Jeff Rovin, Ken Neisser, David Gersh, Adam Berkowitz, Gregory Garcia, Sheldon Sroloff, and Ozzie Alvarez; Statement of Uncontroverted Material Facts and Conclusions of Law; and Proposed Order filed concurrently herewith]<br><br>Time:     1:30 p.m.<br>Date:     January 12, 2009<br>Ctrm:     6<br><br>Trial Date: April 21, 2009 |

Mitchell
Silberberg &
Knupp LLP

2050529.9

Notice of Motion and Motion for Summary Judgment

TO THE CLERK OF THE COURT AND ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on January 12, 2009, at 1:30 p.m., or as soon thereafter as the matter may be heard in Courtroom 6, located at 312 N. Spring Street, Los Angeles, CA 90012, Defendants NBC Universal, Inc. (erroneously sued as "National Broadcasting Company") and Gregory Thomas Garcia will and hereby do move, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order entering summary judgment in their favor and against Plaintiff Mark Gable on the First Amended Complaint and all causes of action set forth therein.

This motion is made on the ground that Plaintiff's claim for relief for copyright infringement fails because (1) Plaintiff cannot raise a genuine issue of material fact that Defendants had access to *Karma!*; and (2) the works at issue as a matter of law are not substantially similar in copyrightable expression.

This motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on November 18, 2008.  This motion is based upon this notice of motion; the attached Memorandum of Points and Authorities; the concurrently submitted Declarations of Jill P. Rubin, Jeff Rovin, Ken Neisser, Adam Berkowitz, Gregory Garcia, David Gersh, Sheldon Sroloff, and Ozzie Alvarez; all pleadings and other records on file in this action; and such further evidence and arguments as may be presented at or before any hearing on the motion.  A Statement of Uncontroverted Material Facts and Conclusions of Law, and a Proposed Order, are lodged herewith.

DATED: December 10, 2008          MITCHELL SILBERBERG & KNUPP LLP


By: /s/ Robert H. Rotstein
Robert H. Rotstein
Attorney for Defendants
NBC Universal, Inc., and
Gregory Thomas Garcia

# <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

I.  INTRODUCTION ................................................................................ 1

II. SUMMARY OF UNDISPUTED FACTS .......................................... 2

   A.  Defendants and Their Television Series *My Name Is Earl*. ................ 2

   B.  Plaintiff and His Screenplay *Karma!* ....................................... 4

      1.  Plaintiff Mark Gable and His Attempts to Submit *Karma!* .................................................................. 4

      2.  Plaintiff's Screenplay *Karma!* ....................................... 6

III. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ................................................................................... 8

   A.  Garcia Created *My Name Is Earl* Without Access to *Karma!* .................................................................. 8

   B.  *My Name is Earl* and *Karma!* are not Substantially Similar in Copyrightable Expression. ........................................ 12

      1.  There are no Substantial Similarities Between *Karma!* and *My Name is Earl* Under the Extrinsic Test. .............................................................. 14

         a.  Plot and Sequence of Events. .............................. 14

         b.  Characters. ...................................................... 16

         c.  Dialogue. ........................................................ 19

         d.  Setting. ........................................................... 19

         e.  Pace. .............................................................. 20

         f.  Theme. ............................................................ 21

         g.  Mood and Tone. ............................................... 21

      2.  A List of Random, Scattered Elements Does Not Give Rise to Substantial Similarity. .......................... 21

IV. CONCLUSION ............................................................................... 25

Mitchell
Silberberg &
Knupp LLP

2050529.9

Notice of Motion and Motion for Summary Judgment

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Berkic v. Crichton*,
   761 F.2d 1289 (9th Cir. 1985) ............................................................ 13, 16

*Brown Bag Software v. Symantec Corp.*,
   960 F.2d 1465 (9th Cir. 1992) ...................................................................... 12

*Cavalier v. Random House*,
   297 F.3d 815 (9th Cir. 2002) ................................................... 13, 16, 21

*Celotex Corp. v. Catrett*,
   477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ............................. 2

*Chivalry Film Prods. v. NBC Universal, Inc.*,
   No. 05 Civ. 5627 (GEL), 2006 WL 3780900 (S.D.N.Y. Dec. 22,
   2006) ............................................................................................................ 22

*Funky Films, Inc. v. Time Warner Entm't. Co,. L.P.*,
   462 F.3d 1072 (9th Cir. 2006) ............................................................. passim

*Idema v. Dreamworks, Inc.*,
   162 F. Supp. 2d 1129 (C.D. Cal 2001) ........................................................ 19

*Jason v. Fonda*,
   526 F. Supp. 775 (C.D. Cal. 1981) ............................................................... 8

*Jason v. Fonda*,
   698 F.2d 966 (9th Cir. 1982) ..................................................................... 8, 9

*Jorgensen v. Epic/Sony Records*,
   351 F.3d 46 (2d Cir. 2003) .................................................................. 8, 9, 10

*Kouf v. Walt Disney Pictures Television*,
   16 F.3d 1042 (9th Cir. 1994) ..................................................... 8, 12, 13, 22

*Litchfield v. Spielberg*,
   736 F.2d 1352 (9th Cir. 1984) ..................................................................... 22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) ............................. 2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Mitchell
Silberberg &
Knupp LLP

2050529.9

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Merrill v. Paramount Pictures Corp.,*
    Case No. CV 05-1150 SVW (MANx),
    2005 WL 3955653 (C.D. Cal. Dec. 19, 2005)..................................... passim

*Meta-Film Assocs., Inc. v. MCA, Inc.,*
    586 F. Supp. 1346 (C.D. Cal 1984)..................................................9, 10, 11

*Olson v. Nat'l Broad. Co.,*
    855 F.2d 1446 (9th Cir. 1988) ...................................................... 19

*Rice v. Fox Broad. Co.,*
    330 F.3d 1170 (9th Cir. 2003) ....................................................... 8, 13

*Scott-Blanton v. Universal City Studios Prods. LLP,*
    539 F. Supp. 2d 191 (D. D.C. 2008) ....................................... 22, 24

*Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.,*
    562 F.2d 1157 (9th Cir. 1977) ...................................................... 8, 13

*Three Boys Music Corp. v. Bolton,*
    212 F.3d 477 (9th Cir. 2000) ......................................................... 8

*Trenton v. Infinity Broad. Corp.,*
    865 F. Supp. 1416 (C.D. Cal. 1994)............................................. 18

*Weygand v. CBS, Inc.,*
    43 U.S.P.Q.2d (BNA) 1120 (C.D. Cal. May 21, 1997) ............................ 16

*Williams v. Crichton,*
    84 F.3d 581 (2d Cir. 1996) .......................................................... 13

**OTHER AUTHORITIES**

4 Melville B. Nimmer & David Nimmer,
    *Nimmer on Copyright,* § 13.02[A] (1999).....................................8

Federal Rules of Civil Procedure 56(c)...............................................2

Mitchell
Silberberg &
Knupp LLP

2050529.9

## I.      INTRODUCTION

To prevail in this copyright infringement action, Plaintiff Mark Gable must prove that Defendants[1] had access to *Karma!* (*i.e.,* had a reasonable opportunity to read Plaintiff's work) and that Plaintiff's work and Defendants' work are substantially similar in copyrightable expression.  Defendants bring this motion for summary judgment because Plaintiff, as a matter of law, can establish neither.

First, Plaintiff cannot raise an issue of fact as to whether Defendants had access to his screenplay *Karma!*.  Plaintiff alleges that in 1995 and 1996 he mailed his script to largely unidentified individuals at various talent agencies in Los Angeles.  However, Plaintiff has no proof that he actually sent his script to these companies, much less that anyone gave his script to any of the Defendants.  Moreover, even if he had, such allegations of "bare corporate receipt" of his script by these agencies cannot raise an issue of fact as to access under controlling law.  Rather, it is incontrovertible that no one associated with the creation of *My Name is Earl* ever received or read Plaintiff's script.

Second, no genuine issue of material fact exists as to whether *Karma!* and *My Name Is Earl* are substantially similar in copyrightable expression.  Plaintiff has evidently sued only because both works use the uncopyrightable ideas of karma and winning money in a lottery.  Far from being similar in copyrightable expression, however, the works at issue differ in plot, sequence of events, characters, theme, setting, dialogue, mood, and pace, and thus fail to satisfy the Ninth Circuit's "extrinsic test" for substantial similarity.  Defendants are entitled to summary judgment for this independent reason.

---

[1]  Defendant Greg Garcia created *My Name is Earl*.  Defendant NBC Universal, Inc. (erroneously sued as NBC) ("NBCU"), is the broadcaster of *My Name is Earl*.

## II.   SUMMARY OF UNDISPUTED FACTS[2]

### A.   <u>Defendants and Their Television Series *My Name Is Earl.*</u>

Defendant Greg Garcia, the creator of *My Name Is Earl*, is an Emmy-award-winning television writer and producer.  UF 1.  Before Plaintiff made the claims that led to this lawsuit, Garcia had never heard of Plaintiff; to this day, Garcia has never read, seen, or received a copy of Plaintiff's screenplay.  UF 2.

Garcia developed the concept for *My Name Is Earl* in the summer of 2003 while on a family vacation to the shore of North Carolina during a break from *Yes, Dear* (a successful, long-running television series that Garcia created).  UF 1.  Inspired by the local surroundings and childhood memories of visiting his friend Mike Pennie (now a writer on *My Name is Earl*) at his home in a trailer park, Garcia conceived of the idea for a television show about a likeable loser who has a near-death experience and is motivated to remedy his karma by righting the wrongs of his past.  UF 1.  During this vacation, Garcia wrote extensive notes containing the basic storyline and characters of the pilot for *My Name Is Earl*.  UF 1.  Upon returning to Los Angeles, Garcia pitched the concept for his new series to his colleagues at *Yes, Dear*.  In the fall of 2004, NBC Universal, Inc. ("NBCU") expressed interest in the series; NBCU eventually agreed to broadcast the series, first airing the pilot on September 20, 2005.  UF 3.  The series is currently in its fourth season.  *Id.*

*My Name Is Earl* is an offbeat situation comedy set in an unspecified middle-American town.  Earl, the main character, is in his mid-thirties and is a likeable lifelong ne'er-do-well and petty thief with pronounced "redneck" characteristics.

---

[2]  A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  Although a court must construe all facts and draw all reasonable inferences therefrom in the light most favorable to the non-moving party, the non-movant must show sufficient evidence to create a genuine issue of material fact.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

His main companion is his comic and slovenly yet good-hearted younger brother Randy.  Earl also maintains a rocky relationship with his fast-talking, trailer-park-residing, morally challenged ex-wife Joy.

In the pilot, Earl wins $100,000 from a lottery ticket purchased in a convenience store, but loses the ticket when almost immediately thereafter he is hit by a car.  During recovery in the hospital, Earl has an epiphany while watching a late-night talk show on which celebrity host Carson Daly attributes his personal good fortune to karma.  Earl decides that his own bad luck and disappointing life must be the result of bad karma, and that "if [he wants] a better life, [he needs] to be a better person."  Earl prepares a "list of everything bad [he's] ever done" and devotes himself to righting his former wrongs.  Soon after, Earl's lost lottery ticket is blown into the courtyard of the motel where he lives, landing on his shoe.

In each series episode, Earl attempts to "cross off" one or more items on his list, assisted by his brother Randy and by Catalina, an attractive young woman who works as a maid at the motel.  Earl's ex-wife Joy frequently comically complicates Earl's efforts.  Joy's current husband the seemingly slow-witted, but actually extremely intelligent Darnell – sometimes referred to as "Crabman" because he works at the local "Crab Shack" hangout – is good-natured toward Earl and often a source of insight into the situations that Earl faces.

The first three seasons of *My Name Is Earl* consist of sixty-nine such list-centered episodes.  A representative sample of these episodes follows:

**Season One:**  In the pilot, Earl provides romantic assistance to a character named Kenny, who Earl bullied in elementary school.  When Kenny turns out to be gay, Earl and Randy must accompany Kenny to a local gay bar.  In another episode, Earl makes amends for burning down a barn during a childhood stay at a local camp for wayward boys.  Returning to the camp with Randy, Earl agrees to build the camp a new ostrich pen.  His plans become complicated, however, when he learns

1   that Randy actually caused the fire.[3]

2   **Season Two**: Earl tries to make things right with Millie, a trailer park bully

3   who Earl tricked into thinking she heard the voice of God.  When Millie (who has

4   since joined a convent) learns of Earl's deception, she loses her faith and moves

5   back to the trailer park, where she resumes her unfriendly ways.  Earl tries to

6   convince Millie to return to her faith by burning the face of Jesus into a grilled

7   cheese sandwich and pretending water in a birdbath has turned into wine.

8   Ultimately, he succeeds and persuades Millie to return to the convent.[4]

9   **Season Three:** Earl goes to prison after taking the blame for a crime that his

10  ex-wife Joy committed.  Even in prison, however, Earl continues to work on his "list

11  items."  One episode focuses on Glen, a fellow inmate who Earl had previously

12  tricked into initiating an ill-advised home robbery scheme.  Earl helps Glen earn his

13  long-deferred "Camden Scout" badge in "natural sciences" by assisting him with a

14  bug collection project.[5]

15      **B.**    **Plaintiff and His Screenplay *Karma!***

16          **1.**    **Plaintiff Mark Gable and His Attempts to Submit *Karma!***

17      Plaintiff Mark Gable a/k/a Mark Pizzuti has no professional experience as a

18

19  [3]  Season One episodes also include "Faked My Own Death" (Earl makes amends

20  for faking his death to avoid breaking up with a woman); "Cost Dad An Election" (Earl helps his father win an election after causing him to lose one years before); "Y2K" (Earl makes amends for stealing a "take a number" machine).

21  [4]  Season Two episodes also include "Larceny of A Kitty Cat" (Earl helps train a cat

22  for a cat show to make up for sabotaging a previous show in favor of Joy's cat); "Robbed A Stoner Blind" (Earl spends a week living an environmentally conscious

23  life to make amends for stealing from a hippie); "Sticks & Stones" (Earl goes to a carnival to atone for making fun of a girl's mustache); "Born A Gamblin' Man"

24  (Earl makes 274 bologna sandwiches to make up for stealing sandwiches from Kenny when they were young).

25  [5]  By the middle of Season Three, Earl has been released from prison, but soon has

26  an accident that puts him in a coma for several episodes.  During his coma, Earl fantasizes that he is in a stereotypical '50s family-style sitcom with his new love

27  interest, Billie.  By the end of Season Three, Earl has emerged from his coma, and, in the final episode, the real Billie forces him to choose between his list and her.

Mitchell
Silberberg &
Knupp LLP

2050529.9

28

writer and has never sold a screenplay.  UF 4.  Plaintiff alleges he wrote *Karma!* in 1995.  Plaintiff made no direct submission of his script to Greg Garcia or to anyone else associated with Garcia or *My Name Is Earl*.  UF 5.  Indeed, Plaintiff had never met Garcia prior to filing this action.  UF 2.  Rather, Plaintiff claims that around 1995, he made unsolicited submissions of his script to a number of major talent agencies in Los Angeles in the hope of finding representation.  Plaintiff has no documentary evidence of any of the purported submissions to any talent agency and has not proffered any theory of access through any means other than such agencies. UF 6.

Between 1993 and the spring of 2000, Garcia was represented by Ken Neisser of The Gersh Agency ("TGA").  Without documentary support, Plaintiff claims that he sent an unsolicited copy of his script to TGA c/o David Gersh in spring 1995. David Gersh never represented Greg Garcia (UF 12), and neither Ken Neisser nor David Gersh ever saw or read Plaintiff's script, much less gave it to Greg Garcia (UF 6, 9-11).  David Gersh has no record of receiving *Karma!*.  UF 12.  In 1995 and at all times since, the policy of TGA has been not to accept unsolicited submissions, and in the event that such a submission was received, either to destroy the submission or to return to the sender with no copies kept.  UF 7.

Since the spring of 2000, Garcia has been represented by Adam Berkowitz, who was now with Creative Artists' Agency ("CAA").  Again without documentary proof, Plaintiff claims that between spring 1995 and fall 1996 he sent unsolicited copies of his script to unidentified persons at William Morris and to CAA. However, Mr. Berkowitz never read or saw Plaintiff's script, much less gave it to Greg Garcia.  UF 19-20.  Neither of these agencies has any record of a submission of Plaintiff's script.  It was the policy of these agencies to record receipt of any script submitted and to return such scripts to the sender.  UF 7, 16-17.  Because no record exists that Gable submitted *Karma!* to these agencies, the only rational

1    conclusion is that these agencies never received Plaintiff's script.[6]

2                        **2.      Plaintiff's Screenplay *Karma!***

3           Set in the seamier parts of New York City, *Karma!* is a dark, gritty, urban

4    drama that tells the story of a forty-two-year-old disgraced police detective named

5    Frankie Agustus.  In the opening scenes, Frankie is convicted for taking bribes on

6    the job, for which he serves a prison sentence.  When released from prison, an

7    unemployed and unkempt Frankie is evicted from his apartment and is reduced to

8    stealing.  However, after stealing a wallet in which he finds the picture of an angel,

9    Frankie receives a series of visitations by an otherworldly angel figure ("Angel

10   Man"), who tells him that he must turn his life around because he has accumulated

11   negative karma, which he is in danger of passing down to his heretofore unknown

12   unborn son.  In this way, *Karma!*'s story has a strong element of the supernatural.

13          In their first encounter, the Angel Man instructs Frankie to meet him the

14   following night at the gravestone of Frankie's deceased mother.  During this

15   meeting, the Angel Man instructs Frankie that, to "save his [unborn son's] soul," he

16   must make amends with the people he has hurt in his past (a concept in accordance

17   with the well-known "twelve-step" programs popularized by Alcoholics

18   Anonymous),[7] no longer steal or take drugs, get a straight job, and use wisely wealth

19   that he will soon obtain.

20          *Karma!* contains two major supporting characters: Frankie's older brother,

21   ─────────────────────────

22   [6]  Based on an allegation in the Complaint, Plaintiff might argue that Brad
     Copeland, a former writer on *My Name Is Earl*, may somehow have had access to
23   Plaintiff's script through his agency United Talent Agency ("UTA").  However,
     even assuming *arguendo* that Plaintiff can raise an issue of fact that UTA received
24   his script (which he cannot), or demonstrate that anyone at UTA read his script
     (which he cannot), or demonstrate that anyone at UTA gave his script to Copeland
25   (which he cannot), there is no access through Copeland.  Copeland did not meet
     Garcia, obtain employment as a writer on *My Name Is Earl*, or contribute creatively
26   to *My Name Is Earl* in any way until after the pilot (the source of the majority of
     Plaintiff's allegedly infringing elements) had already been written and filmed.  UF
27   21.

     [7]  Upon the Angel Man's reference to making amends, Frankie immediately asks,
28   "Hey! Isn't that one of the twelve steps of recovery?"

1   Monsignor Anthony Agustus, a virtuous fifty-year-old Catholic priest; and Frankie's

2   love interest, Toni Ann, a twenty-seven-year-old over-the-hill model initially

3   described as "constantly stoned" who has connections to underworld criminals.

4   Frankie seeks out several people he has harmed or mistreated in the past (including a

5   former girlfriend, but not the mother of his unborn child), gets a part-time job as a

6   bartender, becomes less tolerant of immoral behavior, and begins to give money to

7   others rather than continuing to steal and cheat.

8        Frankie also begins to win money in the lottery.  Soon after his second

9   encounter with the Angel Man, he wins a small prize of three hundred dollars from a

10   "scratcher" ticket he buys in a liquor store.  Later, toward *Karma!*'s end, he wins

11   two million dollars in a Lotto-type jackpot.  Frankie arranges for one million dollars

12   of these winnings to be donated to an orphanage that burned down in a fire.

13        *Karma!* ends with Frankie's infiltration of a criminal scheme involving a

14   large shipment of heroin. Although Frankie is no longer on the police force, he has

15   told his former lieutenant that he wants to clear his name by playing the lead role in

16   the bust, which the lieutenant permits him to do.  Soon after Frankie wins the lottery

17   jackpot, a violent scene ensues in which Sonny, a sadistic criminal, orchestrates the

18   fatal bombing of a car containing two of Frankie's former police associates.  Frankie

19   and Sonny, now together in a tractor trailer, plummet from a bridge into a river,

20   where they struggle in the water until Sonny gives up.  Despite the loss of life,

21   Frankie is heralded by his former lieutenant as having "pull[ed] off" the bust.  Later,

22   back at Toni Ann's apartment, Toni Ann shows Frankie a newspaper headline

23   proclaiming "x-bad cop [sic] makes good."

24        At that very moment, however, James Randson, the criminal ringleader,

25   arrives at Toni Ann's apartment.  A shootout ensues, and although the Angel Man

26   materializes to protect Toni Ann, both Frankie and James are mortally wounded.  In

27   his dying moments, Frankie tells Toni Ann that he will always love her, and the

28   screen fades to black.  The action reopens in an uncertain location that may be the

"after world."  Frankie opens his eyes and is shown to have "huge white wings like the Angel Man" and to be "clothed like the Angel Man."  The Angel Man tells Frankie, "You fell from grace, you've earned them [*i.e.,* the wings] back," and that it is time to "cross over."  On the final page, Frankie appears as an angel "watching over" Toni Ann at her bedside.  After the now-angelic Frankie becomes a "tiny ball of light" that disappears into the sky – *à la* Frank Capra's *It's A Wonderful Life* – there is a fadeout.

## III.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT

"To establish copyright infringement … [a] plaintiff must show that he owns a valid copyright in his screenplay, and that the defendant … copied protected elements of it."  *Kouf v. Walt Disney Pictures Television,* 16 F.3d 1042, 1044 n.2 (9th Cir. 1994)  To establish unlawful copying, a plaintiff must show both that defendant had access to plaintiff's work and that there is substantial similarity of protected expression between the copyrighted work and the defendant's work.  *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1174 (9th Cir. 2003); *Kouf*, 16 F.3d at 1044 n.2.  Plaintiff cannot raise a genuine issue of fact as to either access or substantial similarity.

### A.    Garcia Created *My Name Is Earl* Without Access to *Karma!*

To prove access, a plaintiff must establish that the defendants had a *reasonable* opportunity to read the plaintiff's work.  *Sid & Marty Krofft Television Prods., Inc.  v. McDonald's Corp.*, 562 F.2d 1157, 1172 (9th Cir. 1977); 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, § 13.02[A], at 13-19 (1999) (quoted in *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482 (9th Cir. 2000)).  A "bare possibility" of access is not enough.  *Jason v. Fonda*, 526 F. Supp. 775, 776-77 (C.D. Cal. 1981), *incorporated by reference*, 698 F.2d 966 (9th Cir. 1982).[8]

---

[8]  Where, as here, a plaintiff cannot show access, summary judgment for the defendant is appropriate unless a plaintiff can adduce evidence that the works at issue are "strikingly similar."  *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 56 (2d Cir. 2003)  "Striking similarities" may give rise to an inference of access only where

(…continued)

1    In copyright infringement cases, the courts – including this Court as recently

2    as 2005 – grant or affirm summary judgment where a plaintiff cannot raise an issue

3    of fact as to access.  *Merrill v. Paramount Pictures Corp.,* Case No. CV 05-1150

4    SVW (MANx), 2005 WL 3955653 (C.D. Cal. Dec. 19, 2005) (Wilson, J.,

5    presiding); *see also Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 51-52 (2d Cir.

6    2003); *Jason v. Fonda,* 698 F.2d 966 (9th Cir. 1982); *Meta-Film Assocs., Inc. v.*

7    *MCA, Inc.,* 586 F. Supp. 1346, 1355 (C.D. Cal. 1984).  "In order to support a claim

8    of access, a plaintiff must offer 'significant, affirmative and probative evidence.'"

9    *Merrill,* 2005 WL 3955653 at *7 (quoting *Jorgensen,* 351 F.3d at 51 (internal

10   citations omitted)).  Here, Plaintiff cannot possibly raise a genuine issue of material

11   fact as to access.

12   Based on what Plaintiff has indicated in discovery, Defendants anticipate that

13   Plaintiff will argue access through his alleged unsolicited submissions to persons

14   unknown at CAA and William Morris, and to David Gersh at TGA.  If so, his

15   argument is frivolous.  Although Plaintiff claims that he sent his script to these

16   major talent agencies, he can proffer no proof of this other than his unsubstantiated

17   assertion.  This lack of proof is fatal to his claim.  In *Jorgensen,* the Second Circuit

18   affirmed the district court's order granting summary judgment for defendants on the

19   issue of access where, as here, the plaintiff (1) "did not maintain a log of where and

20   when he sent his work, or keep receipts from certified mailings to establish a chain

21   of access," and (2) produced no "reasonable documentation that he actually mailed

22   [tapes of the allegedly infringed work]."  351 F.3d at 52 (internal citations omitted).

23   Similarly, in *Merrill,* the plaintiff claimed that he had "mailed copies of his script …

24   _____

25   (…continued)
     the works are "so strikingly similar as to preclude the possibility of independent

26   creation."  *Meta-Film Assocs., Inc. v. MCA, Inc.,* 586 F. Supp. 1346, 1355 (C.D. Cal
     1984).  However, for all the reasons discussed below, none of the alleged

27   similarities between the two works rises even to the level of substantial similarity,
     much less to the level of striking similarity.  UF 32.

Mitchell
Silberberg &
Knupp LLP

2050529.9

28

1   to 'any film studio or record label address he could find,'" including to one of the

2   defendants.  2005 WL 3955653 at *1 (internal citations omitted).  However, like

3   Plaintiff here, the plaintiff in *Merrill* did not provide any documentary evidence to

4   show that he had mailed his script to the defendants, or to any person associated

5   with defendants, before the defendants created a treatment for the allegedly

6   infringing work.  *Id.* at *8-9.  Also like Plaintiff here, the plaintiff in *Merrill* could

7   not recall exactly when his alleged submissions had been made.  *Id.* at *8-9.  Stating

8   that "lack of documentation" regarding submission of plaintiff's script prior to

9   defendants' creation of their work "militates in favor of summary judgment," this

10   Court found that the plaintiff could not "survive summary judgment merely by

11   stating that he sent [his script] at unspecified times to corporate ... addresses."  *Id.*

12         Neither can Plaintiff raise an issue of fact as to access merely because he

13   purportedly sent his script to agencies that employed agents for Garcia.  It is

14   uncontroverted that Plaintiff never sent his script to Garcia's agents, Adam

15   Berkowitz and Ken Neisser, but only purportedly to others who worked at these

16   agencies.  In granting summary judgment in *Merrill*, this Court recognized that

17   "bare corporate receipt" of plaintiff's work by a corporate entity with some

18   connection to defendants was insufficient to preclude a finding of summary

19   judgment.  2005 WL 3955653 at *9; *accord, Jorgensen*, 351 F.3d at 53, 53 n.5; *see*

20   *also Meta-Film*, 586 F. Supp. at 1357-58  As the court in *Meta-Film* noted,

21   "countless unsolicited scripts are submitted to numbers of individuals [at

22   entertainment companies] every day.  Under these circumstances, it is clearly

23   unreasonable to attribute the knowledge of one individual – especially a non-

24   employee – to every other individual [at the same entertainment company]."  586 F.

25   Supp. at 1357-58.  It follows that even if Plaintiff could establish that he sent his

26   scripts to the talent agencies, he cannot raise a genuine issue of material fact as to

27   access.

28         In addition, even putting aside the legal deficiencies in Plaintiff's corporate

receipt theory, the incontrovertible evidence establishes that none of the Defendants had access to his *Karma!* script.  In *Meta-Film,* the court held that a plaintiff's submission of his script to a director who maintained an office at a studio with which he was under contract failed to create a genuine issue that the studio had access to the script when it produced an allegedly infringing film.  586 F. Supp. at 1357-58.  Instead, the court found that such claims of access require a "nexus between the defendant and the individual possessing knowledge of the plaintiff's work" or an "intermediary."  *Id.* at 1355.  This intermediary must have been either (1) "a supervisor with responsibility for the defendant's project"; (2) a "part of the same work unit as the copier"; or (3) someone who "contributed creative ideas or material to the defendant's work."  *Id.* at 1355-56.  And, "at minimum, the dealings between the plaintiff and the intermediary and between the intermediary and the alleged copier must involve some overlap in subject matter to permit an inference of access."  *Id* at 1358.  Plaintiff can satisfy none of these factors as a matter of law.

Plaintiff's flawed access theory is analogous to the access theory that this Court rejected in *Merrill*.  There, the plaintiff alleged that he had sent his script to MTV, a distributor of the allegedly infringing work, and to the fan club for Britney Spears, star of the allegedly infringing work.  *Merrill,* 2005 WL 3955653 at *8-9.  This Court found that there was no evidence that MTV had received a copy of his script before creation of the allegedly infringing work or that MTV had involvement in the creative process.  As to the fan club, the Court held that plaintiff could not establish that the fan club received the script or forwarded it to the defendants.  To the contrary, "Defendants [had] presented uncontroverted evidence that the fan club was not authorized to accept unsolicited materials … and that the Spears management team had a policy of not accepting unsolicited materials from any source."  *Id.*

In light of the foregoing authorities, Plaintiff's speculative assertion of access based on submission to the talent agencies is futile.  Greg Garcia, his current agent

1    Adam Berkowitz, and his former agent Ken Neisser have all testified that they never

2    read or even had possession of Plaintiff's script.  Moreover, neither Berkowitz nor

3    Neisser had a creative role in *My Name is Earl*.[9]  More than that, none of the

4    agencies has a record of receiving *Karma!*, and all had policies that unsolicited

5    scripts would not be read.  Both agencies at which Berkowitz has worked

6    maintained records of scripts submitted, and neither has a record of ever having

7    received Plaintiff's script.  In sum, Defendants are entitled to summary judgment

8    because Plaintiff, as a matter of law, cannot establish access to his script.

9        **B.**    ***My Name is Earl* and *Karma!* are not Substantially Similar in**

10           **Copyrightable Expression.**

11           Even assuming *arguendo* that Plaintiff could raise an issue of fact as to

12   access, Defendants are entitled to summary judgment for a second, independent

13   reason:  Plaintiff cannot raise a material fact as to substantial similarity of

14   copyrightable expression.  The Ninth Circuit has established a two-part test, known

15   as the "extrinsic" and "intrinsic" tests, to determine whether two works are

16   substantially similar in protected expression.  In deciding a motion for summary

17   judgment, however, the Court evaluates and applies only the "extrinsic" test, which

18   "involves an objective comparison of the two works."  *Merrill*, 2005 WL 3955653

19   at *9; *see also Funky Films, Inc. v. Time Warner Entm't. Co,. L.P.*, 462 F.3d 1072,

20   1077 (9th Cir. 2006).  Only the extrinsic test, which "examines not only similarity of

21   ideas but also objective similarity of expressions" is relevant for summary judgment.

22   *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1477 (9th Cir. 1992); *see*

23   *also Funky Films*, 462 F.3d at 1077; *Merrill*, 2005 WL 3955653 at *9.  A "plaintiff

24   who cannot satisfy the extrinsic test necessarily loses on summary judgment,

25   because a jury may not find substantial similarity without evidence on both the

26   extrinsic and intrinsic tests."  *Kouf*, 16 F.3d at 1045.

---

9  Indeed, Neisser ceased being Garcia's agent long before Garcia conceived of *My Name is Earl*.

When conducting the extrinsic test, a court must review the works at issue. *Kouf*, 16 F.3d at 1045 (approving district court's "conscientious[] outline[]" of the two works at issue).  To aid the court's inquiry under the extrinsic test, expert testimony and analytic dissection are appropriate.  *Sid & Marty Krofft*, 562 F.2d at 1164.  In literary works like those at issue here, the extrinsic test focuses on "'articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events.'"  *Rice*, 330 F.3d at 1174 (quoting *Kouf*, 16 F.3d at 1045).  Copyright does not protect ideas, but only the expression of those ideas. *Rice*, 330 F.3d at 1174; *Kouf*, 16 F.3d at 1045; *Berkic v. Crichton*, 761 F.2d 1289, 1293-94 (9th Cir. 1985).  Neither does copyright protect so-called *scènes à faire* – standard treatments or clichés that flow from common unprotectable ideas.  *Rice*, 330 F.3d at 1175; *Berkic*, 761 F.2d at 1293.  Therefore, the Court "must take care to inquire only whether the *protectable elements, standing alone*, are substantially similar," *Cavalier v. Random House*, 297 F.3d 815, 822 (9th Cir. 2002) (quoting *Williams v. Crichton,* 84 F.3d 581, 588 (2d Cir. 1996) (emphasis in original)), and must "filter out and disregard the non-protectable elements," such as "scenes a faire, which flow naturally from generic plot-lines." *Funky Films*, 462 F.3d at 1077.

As the authorities cited above show, courts frequently sustain summary judgment for defendants under the extrinsic test. Indeed, this Court three years ago granted summary judgment under the extrinsic test.  In *Merrill*, plaintiff alleged a number of similarities between his script *Dream Alive* and defendants' film *Crossroads*.  2005 WL 3955653 at *10-11.  Although the Court recognized that both scripts involved, for example, groups of young people who travel across the country, a female lead who sings at an audition, a romance with a male lead with a vintage car, a father who resists the female lead's singing career, a fight scene, and a character's infidelity, the Court, applying the extrinsic test, concluded that no reasonable jury could find the works to be substantially similar.  *Id.* at *9-14.

1      **1.      There are no Substantial Similarities Between *Karma!* and**

2            ***My Name is Earl* Under the Extrinsic Test.**

3            A comparison of the plot, sequence of events, theme, setting, characters,

4      dialogue, pace, mood and tone in *Karma!* and *My Name is Earl* reveals that, as a

5      matter of law, the works share no substantial similarity in protected expression.

6      (For a detailed discussion of the lack of substantial similarity, see Declaration of Jeff

7      Rovin ("Rovin Decl.").

8                  **a.      Plot and Sequence of Events.**

9            At the level of copyrightable expression, the plots of the works at issue here

10     differ markedly.  *Karma!* is a melodramatic story of a corrupt ex-cop who has been

11     visited by an angel and instructed to change his bad ways for the sake of his unborn

12     son's karma.  Frankie makes no list of bad deeds or of people with whom he must

13     make amends, and *Karma!* does not focus on his efforts to make amends.  Rather,

14     although Frankie makes a few haphazard attempts to reconcile with others, the plot

15     actually focuses on his involvement in a successful drug sting operation.  Only

16     relatively late in the script does Frankie win two million dollars in the lottery (and,

17     unlike Earl, does not lose his ticket), half of which he gives to his priest brother to

18     rebuild an orphanage.  Frankie is then slain by a drug lord and is escorted to Heaven

19     by the Angel Man, eventually becoming Toni Ann's guardian angel.

20           In contrast, *My Name is Earl*, which follows the story of Earl Hickey and his

21     friends and family, is a lighthearted half-hour comedy series rife with farce and

22     slapstick humor.  After purchasing a winning lottery ticket in a convenience store

23     and immediately losing the ticket after being hit by a car outside the store, Earl, a

24     likeable ex-petty thief, sees Carson Daly on television speaking about karma.  Earl

25     decides that his bad deeds were the reason he has lost the lottery ticket, and more

26     generally are the cause of his terrible life.  As a result, Earl resolves to become a

27     better person in order to improve his lot in life.  Soon after making this decision, the

28     missing lottery ticket reappears on Earl's shoe.  With the practical merits of good

behavior confirmed for Earl, he makes (and throughout the series, continues to add to) a written list of every bad deed he has committed throughout his life and resolves to rectify each precise wrong until all his list items are exhausted.  Despite Plaintiff's allegation to the contrary, there is nothing even remotely resembling this list in *Karma!*.  As a matter of law, no reasonable person could find the plots of the two works substantially similar.

In addition, the sequences of events in the two works are entirely dissimilar. *Karma!* is told almost entirely chronologically.  It moves slowly through the plot points and character issues as Frankie is arrested for bribery, serves a prison sentence, becomes a virtual derelict, is visited by a supernatural being, and seeks salvation for the sake of his unborn son by becoming involved in a law enforcement sting operation.  The story ends with Frankie's violent death and transformation into an angel.  This sequence of events is entirely without equivalent in *My Name Is Earl*, which is rarely presented with a straightforward timeline and instead pauses for frequent flashbacks and dream sequences, as well as unrelated subplots. Moreover, even on the few occasions where an event in one script has a vague and uncopyrightable "counterpart" in the other, these events occur in radically different positions and serve different functions.  For example, in *Karma!*, Frankie wins a large lottery prize only at the *end* of the script, as if being rewarded for having changed his ways.  In contrast, in *My Name Is Earl,* the pilot episode *begins* with an unreformed Earl buying a winning lottery ticket, and it is his experience with this ticket that brings about his decision to change.  As another example, in *Karma!* Frankie serves a prison sentence for his actual crimes at the beginning of the story and before the angel intervenes (an event without corollary in *My Name Is Earl*).  In *My Name is Earl*, not until the third season does Earl *willingly* serve a prison sentence for a crime he did not commit, long after his decision to make a radical change in his life.

As noted, Plaintiff seems to have brought this lawsuit simply because he

Mitchell
Silberberg &
Knupp LLP

2050529.9

believes that both works involve the ideas of karma and using money from lottery winnings or other prize money for good.  However, such abstract plot ideas are not copyrightable.  *Berkic*, 761 F.2d at 1293 ("General plot ideas … remain forever the common property of artistic mankind."); *see also Funky Films*, 462 F.3d at 1081 ("[g]eneral plot ideas are not protected by copyright law; they remain forever the common property of artistic mankind." (quoting *Berkic*, 761 F.2d at 1293)); *Cavalier*, 297 F.3d at 822 ("basic plot ideas … are not protected by copyright law"); *Weygand v. CBS, Inc.*, 43 U.S.P.Q.2d (BNA) 1120, 1125, 1125 n.18 (C.D. Cal. May 21, 1997) ("general plot idea of an African-American farmer who takes in a white child" is not protected because "[b]asic plot ideas are not protectable").[10]

Thus, other than a few generic uncopyrightable ideas (*e.g.*, a protagonist whose change is somehow related to karma, use of lottery winnings, and prison sentences as plot devices), the plots and sequences of events of the two works are expressed in entirely dissimilar ways.

**b.    Characters.**

The characters in the two works are wholly dissimilar.  The main characters of the two works (Frankie in *Karma!* and Earl in *My Name Is Earl*) bear no

---

[10]  The basic ideas of karma and the search for redemption are not copyrightable and indeed are found in various combinations in numerous prior works, including Charles Dickens' classic story *A Christmas Carol* (1843); Lafcadio Hearn's and Paul Carus's respective short stories entitled *Karma* (respectively 1890 and 1894); the television series *Highway to Heaven* (1984); the motion picture *Almost An Angel* (1990); the television series *Xena: Warrior Princess* (1995); the television series *Forever Knight* (1992); and the comic book series *Plasticman* (1941).  *See* Rovin Decl., Ex. 1 at 11-29.

Similarly, the generic plot idea of using money from lottery winnings or other prize money for good is a general idea and *scène à faire* that is not entitled to copyright protection.  *See* Rovin Decl., Ex. 1 at 18-19.  Works that feature a plot line in which money from a winning lottery ticket is used for the better include the 1931 film *Le Million* (self-absorbed young man wins lottery, loses ticket, and learns life lessons as he pursues the ticket), the Mary Higgins Clark novel *Weep No More, My Lady* (woman becomes amateur detective after winning lottery), the comic book *Flash*, Vol. 2 #1, 1987 (superhero unable to afford to do good until he wins the lottery); the 1994 motion picture *It Could Happen To You* (a New York City police officer wins the lottery and shares the ticket with a woman with whom he falls in love).  *Id.*

Mitchell
Silberberg &
Knupp LLP

2050529.9

resemblance to each other.  Frankie is a disgraced New York City ex-cop and ex-con in his mid-forties with a bitter attitude, foul mouth, and short temper who is a seasoned extortionist and who was kicked off the police force for corruption.  After a visitation by an angel, Frankie is instructed to go on a search for redemption in order to improve the karma of his unborn son, a journey that ends in his violent death.

In contrast, Earl is an early thirties "redneck" and likable loser with a positive, humorous attitude towards life.  Earl is neither an ex-police officer (or a current police officer) nor a skilled shakedown artist, but rather a bumbling ex-petty thief seeking reform.  He does not die, has no unborn son, receives no otherworldly visitation, and has a wholly self-imposed character transformation as a practical means to improve his own day-to-day wellbeing.

In his pleadings and discovery responses, Plaintiff compares Frankie's older brother Monsignor Anthony Agustus, a "50 year old Italian Catholic Priest," to Earl's younger brother Randy, a bumbling unemployed thief who has slept on Earl's couch for years.  In fact, these characters could not be more different.  The Monsignor in *Karma!* is wise, moral, articulate, intelligent, a Catholic priest, and an upstanding member of the community.  By comparison, Randy is a good-natured but simple young man who has aided Earl in his past petty crimes, but who now helps Earl cross off items on his list, thus becoming caught up in Earl's escapades.

Plaintiff further compares Toni Ann, Frankie's love interest, with Joy, Earl's ex-wife.  However, these characters are quite different as well.  Toni Ann is a "27 year old wanna be model" from New York who also works as a drug dealer.  She is "constantly stoned" on marijuana and heroin.  By comparison, Joy is a comedic character who speaks with a marked southern accent, is not Earl's "love interest," does not do drugs, is not a model, and lives in a trailer with her new husband Darnell and her children.

Plaintiff also compares his character Shrimp, a "23-year old punk kid of Afro-

1  American background" from the streets of New York, with *My Name is Earl's*

2  Darnell, Joy's new husband, who works at the Crab Shack (hence his nickname

3  "Crabman").  Apparently, Plaintiff makes this allegation because both nicknames

4  refer to crustaceans and both characters are African American.  However, Shrimp is

5  a hostile, crude-speaking youth who is an aspiring street thug.  He is called

6  "Shrimp" not because of some reference to seafood, but because he is small in

7  stature.  In contrast, Darnell, who lives with Joy in a trailer park, is unexpectedly

8  erudite, graduated from college at 14, speaks several languages, often displays

9  flashes of wit, plays the cello, has a pet turtle, and is otherwise a mystery because he

10  is part of the Witness Protection Program.  Darnell is calm and scrupulously moral.

11  He is called "Crabman" occasionally because he works at a crab shack.  That two

12  characters are African American, is not a similarity.  Clearly, Shrimp and Darnell

13  are entirely different characters.[11]

14      Furthermore, both works contain characters that have no conceivable

15  counterpart in the other work, and Plaintiff has not contended otherwise.  For

16  example, there are no claims of alleged counterparts in *My Name is Earl* to the

17  following characters in *Karma!*: the prominent character of the "Angel Man,"

18  Lieutenant Sowers, Detective Skinnerd, Detective Dawgs, and Sharon the Waitress.

19  Nor are there claimed counterparts in *Karma!* to the following recurring characters

20  in *My Name Is Earl*:  Catalina, Patty the Daytime-Hooker, Willie the One-Eyed

21  Mailman, and Earl's father Carl Hickey.  Taken individually or cumulatively, the

22  characters in the works are not substantially similar.

23
24
25
26
27
28

---

[11]  Plaintiff concocts other purported similarities of characters, all to no avail.  For example, the character of Coco in *Karma!* is a young drug-using female friend of Toni Ann, who features prominently throughout *Karma!*, while the character of Steve Coco is a male friend of Earl mentioned only in passing and never seen on screen. Likewise, the character of Mrs. Stewart, Frankie's "sweet 48 year old" landlady, could hardly be more different from the character of the hapless police officer *Stuart* Daniels in *My Name is Earl*.  Moreover, names are not copyrightable.  *Trenton v. Infinity Broad. Corp.*, 865 F. Supp. 1416, 1426 (C.D. Cal. 1994) ("…the regulations of the Copyright Office expressly provide that '[w]ords and short phrases such as names, titles and slogans' are not subject to copyright.").

### c.     Dialogue.

"[E]xtended similarity of dialogue [is] needed to support a claim of substantial similarity based upon this issue." *Olson v. Nat'l Broad. Co.*, 855 F.2d 1446, 1450 (9th Cir. 1988); *Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1185 n.67 (C.D. Cal 2001) ("[p]laintiffs again confuse the 'idea' conveyed by a particular piece of dialogue with the protectable 'expression' thereof."). There is no substantial similarity in dialogue between *Karma!* and *My Name is Earl*.[12] Most significantly, the language of *Karma!* is rooted in the urban street and employs vernacular with a considerable amount of profanity (something that never occurs in *My Name Is Earl*). For example, Teenager #2 tells Frankie, "Look holmes [sic]! you're <u>messin</u>' with the wrong mother fucker." When Frankie replies to him, "Just relax, everything's dope," Teenager #2 responds that Frankie "should mind [his] own business before [he gets] <u>wacked</u> [sic]." In contrast, the dialogue in *My Name Is Earl* is generally good natured and is riposted for comedic effect. For example, when Earl tries to replace Joy's broken childhood beauty pageant trophy, Joy demands a hot tub instead. ("That little girl is gone now," she quips, "and the woman that took her place wants to sit and drink rum in 106-degree water.") There exists no similarity in dialogue, much less a substantial one, between the two works.

### d.     Setting.

The settings for the two works also differ. *Karma!* is set specifically in the gritty underbelly of New York City, in a primarily nocturnal world of dark alleys, seedy bars, and rundown apartments. Other scenes depict lavish and decadent urban nightlife (*e.g.,* a party at James Randson's penthouse apartment). In contrast, *My*

---

[12] Plaintiff's transparent attempt to invent similarities where none exists is exemplified by his interrogatory response in which he claims that dialogue in *Karma!* where the Angel Man reprimands Frankie for saying "Well I'll be damned" is similar to a scene where Mrs. Balboa cautions Earl about his swearing when he remarks, "She [Joy] only got one figure and I blew it up.  Damn." ("Broke Joy's Fancy Figurine").  It is difficult to imagine a type of dialogue that could be less original or less protectable.

Mitchell
Silberberg &
Knupp LLP

2050529.9

*Name Is Earl* is set in generic middle-American suburban locales that are typically bathed in sunlight.  Stories unfold in strip malls, motor inns, and trailer parks, which although often inelegant, are neither lush and expensive nor rundown or threatening (*e.g.*, the motel where Earl and Randy live, Joy and Darnell's kitschy trailer, the appliance store where Earl gets a job, and even the prison where Earl has landed after taking the blame for Joy's crime).  There exists simply no similarity in setting, much less a substantial one, between the two works.

### e.   Pace.

The two works are not paced in a similar manner.  In *Karma!*, characters are introduced slowly with a considerable amount of exposition.  They are depicted in their raw, unreformed states before the Angel Man arrives and places Frankie on the path that will force his character development and the development of the characters who surround him.  Frankie is rarely off stage, and, after the opening montage, the narrative occurs more or less in the context of Frankie's on-screen time.  After Frankie gets out of jail, the story appears to unfold in less than a week.  Conversely, *My Name Is Earl* presents and resolves almost every individual story in episodes that run roughly twenty minutes each, and little time is spent on character nuance. Each episode is almost entirely about plot and plot twists, each of which is classically structured in three acts of more-or-less equal length (due to the positioning of commercial breaks):  (1) a problem is presented, (2) complications are added, and (3) the situation is improbably resolved.   Viewers learn, at best, only a little about the characters each week.  Thus, the plots move forward at a rapid pace with little exposition (unlike *Karma!*).  The unfolding of Earl's quest for redemption takes place primarily over at least a year, during which time Joy becomes pregnant and gives birth, and over an even longer period when considering the flashbacks to Earl's childhood.  There exists no similarity in pace, much less a substantial one, between the two works.

1     **f.     Theme.**

2        While both works deal with the uncopyrightable themes of karma and

3   redemption, *Karma!* deals with redemption that is forced upon Frankie by a mystical

4   outside source (the "Angel Man"), in an attempt to fix the karma of Frankie's

5   unborn son.  Conversely, Earl draws his own personal conclusions about karma and

6   comes to his own decisions about changing his ways to improve the day-to-day

7   quality of his life.  There is no outside spiritual voice that commands Earl to

8   improve his karma – rather, when good things happen to Earl, they could simply be

9   coincidence or the result of his giving up a more dangerous life.  (Indeed, in contrast

10  to Plaintiff's script, Earl's entire belief in karma may be an illusion.)  The themes of

11  compelled redemption for the sake of another and voluntary redemption for entirely

12  self-serving (albeit comically endearing) reasons are entirely dissimilar.

13     **g.     Mood and Tone.**

14       The mood and tone of the two works could not be more dissimilar.  The

15  pervasive hard-core gangsterism and dark and threatening street life of *Karma!* are

16  reflected in the generally grim nature of most of its characters, while *My Name Is*

17  *Earl* is relentlessly light and silly.  There is no tragedy in *My Name Is Earl*, and not

18  even Earl's coma (with its '50s-sitcom dream sequences) or jail time (with

19  skinheads who request umbrellas to avoid sunburn) discourages the quirky good

20  humor of the series.  The works are not substantially similar in mood or tone.

21       For all of these reasons, application of the extrinsic test demonstrates that

22  Plaintiff cannot, as a matter of law, establish copyright infringement.  Defendants

23  are therefore entitled to summary judgment.

24     **2.     A List of Random, Scattered Elements Does Not Give Rise to**

25            **Substantial Similarity.**

26       In discovery, Plaintiff has nevertheless set forth a litany of random, scattered

27  elements that supposedly give rise to substantial similarity.  Plaintiff's list cannot

28  raise a genuine issue of material fact.  *See Cavalier*, 297 F.3d at 825 ("a compilation

of 'random similarities scattered throughout the works' is 'inherently subjective and unreliable,'") (quoting *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984) (internal citations omitted)); *Kouf*, 16 F.3d at 1045-46 (rejecting plaintiff's "compilation of 'random similarities throughout the works' such as a lawnmower scene, a sprinkler scene, the presence of an attic, danger scenes, concerned parents, and kids sleeping outside overnight.") (internal citations omitted). *See also Scott-Blanton v. Universal City Studios Prods. LLP,* 539 F. Supp. 2d 191, 201 (D. D.C. 2008) (rejecting plaintiff's list containing over 50 elements that were alleged to establish substantial similarity); *Chivalry Film Prods. v. NBC Universal, Inc.*, No. 05 Civ. 5627 (GEL), 2006 WL 3780900 at *2 (S.D.N.Y. Dec. 22, 2006) (granting summary judgment for defendants, stating, "[p]laintiff attempts to show similarity by providing a long chart of alleged similarities between specific scenes … For example, in [defendants' work] the fiancée's father ridicules his prospective son-in-law's car, and in [plaintiff's work] the abusive landlord is critical of his tenant's vehicle.  Even if the scenes were otherwise similar, there is nothing original in either scene." (internal citations omitted).

In *Funky Films*, the Ninth Circuit once again rejected such an approach.  The plaintiffs alleged, and the Court accepted as true, the following similarities:

> [B]oth works concern "a narrative about a small funeral home, and the lives of the people who operated it"; plot lines involving "the death of the father … [who] has for decades run the business"; a father whose death is "unexpected and not attributable to natural causes" … and the presence of his "two sons" who receive equal shares of the business, with the "older son … liv[ing] in a distant city, working outside the funeral industry"; in both works an older son initially "has no interest in becoming involved with the funeral business"; moreover, [t]he "family business is financially fragile and in both works the funeral home is pointedly shown to be in debt and operating out of a

1   substandard facility with obsolete equipment and a hearse that stalls."
2   Both works also contain an attempt by a "rival funeral home,"
3   spearheaded by "the female principal of the rival business" to "take []
4   advantage of their vulnerable financial condition," "bluntly mak[ing]
5   a lowball offer" and "approaching one of the brothers at the father's
6   funeral with a proposal to buy the family business."  In both works,
7   the older brother who initially "expresses his desire to sell" but
8   "changes his mind and commits to help his brother keep the business
9   afloat."  Finally, … the older brother's creativity … stands "in pointed
10  contrast to the leaden conservatism of the younger brother"; … the
11  funeral home used as a "site for musical entertainment"; … the
12  "younger brother … change[s] his church affiliation in order to
13  increase their client base" in both works; and the "rival's takeover
14  attempt does not succeed."

15  462 F.3d at 1077-78.  The *Funky Films* court stated, "[a]t first blush, these apparent
16  similarities in plot appear significant," but nevertheless affirmed the district court's
17  order granting summary judgment, finding "few real similarities at the levels of plot,
18  characters, themes, mood, pace, dialogue, or sequence of events." *Id.* at 1078.
19  When those factors were examined on a concrete level, rather than an "abstract
20  level," the requisite substantial similarity of protected expression was absent. *Id.*

21  Plaintiff's list of scattered similarities is both inaccurate and insufficient to
22  raise a genuine issue of material fact as to substantial similarity.  For example,
23  Plaintiff has listed "corresponding" scenes regarding "crossing over" to the afterlife
24  as demonstrating the similarity of the two works.  However, the markedly different
25  treatment in the two works of this stock scene, common in the prior art,[13] serves

26

27  ───────────────
    [13] *E.g., Here Comes My Jordan* (character dies and travels to a misty realm where
28  he speaks with men in suits regarding his transition to Heaven) (1941); *Heaven Can Wait* (same) (1978); *Down To Earth* (same) (2001); *Almost An Angel* (character
    (…continued)

1   only to underscore the dissimilarities between *Karma!* and *My Name Is Earl*.   In

2   *Karma!*, Plaintiff uses the hackneyed cliché of a heavenly representative escorting

3   the protagonist to the "other side" as the earnest and melodramatic conclusion to

4   Frankie's journey for redemption.   In *My Name Is Earl*, the relevant scene is merely

5   part of Earl's in-coma dream sequence of a '50s-style family sitcom life and a

6   tongue-in-cheek parody of the cliché, complete with swirling mist and a knock at the

7   door by a transportation professional to escort him on his heavenly journey (an offer

8   he refuses).  Similarly, Plaintiff alleges that the presence of scenes in prison in both

9   works demonstrates the similarity of the works.  However, even aside from the

10  marked dissimilarity of the prison scenes (*scènes à faire* in works involving

11  criminals) in both works – the prison in *Karma!* is a dark and threatening location,

12  while the prison in *My Name Is Earl* is a lighthearted location complete with

13  friendly guards and skinheads who only want umbrellas to go outside for recreation

14  – such stock settings as a prison are wholly unprotectable.  *See, e.g., Scott-Blanton*,

15  539 F. Supp. 2d at 202 ("Indeed, the public domain would have a scant selection if

16  stock settings such as the movie theatre, the kitchen, Las Vegas, a church picnic or a

17  club were subject to copyright protection.").

18          Moreover, as a general matter, Plaintiff's list of purported similarities would

19  prove too much.  Accepting Plaintiff's technique of concocting lists of scattered

20  similarities would lead to the conclusion that in writing *Karma!*, Plaintiff himself

21  infringed the copyright in earlier works.  For example, in the popular NBC

22  television series *Highway to Heaven* (1984-1989), a lead character is, like Frankie in

23  *Karma!*, a hard drinking big city ex-cop who is confronted by an angel and teams up

24  with him to turn his life around and do good.  Application of Plaintiff's flawed

25  methodology to his own work and to *Highway to Heaven* yields more than seventy

26  _____

27  (…continued)
    believes he is dying and has a vision of traveling to a misty realm where he

28  discusses whether it is his time to "cross over") (1990). *See* Rovin Decl. Ex. 1 at 23.

1   "similarities" between the two works.  *See* Rovin Decl. Ex. 1 at Appendix 2.

2   Likewise, in the Paramount Pictures' film *Almost An Angel*, first released in 1990,

3   the protagonist is, like Frankie in *Karma!*, a foul-mouthed small time thief who

4   serves a prison sentence, encounters a heavenly figure who tells him to change his

5   ways, redeems his past bad behavior, donates a fortune to a priest in a church,

6   spends time in a bar, arranges for a donation to a children's center, and finally learns

7   he is an angel at the end, among other "similarities."  Indeed, a similar comparison

8   can be made between Plaintiff's work and Dickens' classic story *A Christmas Carol*.

9   For example, to cite only a few similarities in both stories, a supernatural being

10  appears to a protagonist who is initially motivated by money, both stories contain a

11  reference to prison, both protagonists have a pious male relative, and both contain a

12  protagonist who looks at an illustration of an angel.  *See* Rovin Decl. Ex. 1 at

13  Appendix 1.   Summary judgment is mandated under the extrinsic test.

14  **IV.   CONCLUSION**

15      As demonstrated above, Plaintiff cannot show either access or substantial

16  similarity under the extrinsic test, as a matter of law.  Accordingly, Defendants

17  respectfully request that their motion for summary judgment be granted.

18

19  DATED:  December 10, 2008         MITCHELL SILBERBERG & KNUPP LLP

20

21                                   By: /s/ Robert H. Rotstein
22                                       Robert H. Rotstein
                                         Attorneys for Attorneys for Defendants,
23                                       NBC Universal, Inc., and Gregory Thomas
                                         Garcia
24

25

26

27